UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAXWELL SHOE COMPANY, INC., | ) ) ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | Case No. 04 CV 10635-RGS |
| JONES APPAREL GROUP, INC., AND MSC ACQUISITION CORP., | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

John D. Donovan, Jr. (130950)
Christopher Dillon (640896)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
617-951-7000

Paul C. Saunders
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, New York 10019
212-474-1000

*Counsel for Jones Apparel Group, Inc., and
MSC Acquisition Corp.*

Dated: April 20, 2004

## **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................................1

BACKGROUND FACTS ....................................................................................................4

THE COMPLAINT'S ALLEGATIONS ..............................................................................6

ARGUMENT ......................................................................................................................7

I.  THE WILLIAMS ACT CLAIMS ARE FACTUALLY AND LEGALLY
    UNTENABLE BECAUSE THE TENDER OFFER STATEMENT CONTAINS
    ALL INFORMATION MATERIAL TO INFORMED DECISION-MAKING
    AND REQUIRED BY APPLICABLE REGULATIONS. ...............................................8

    A.  *The Williams Act's Disclosure Regime* ...................................................9

    B.  *Jones Apparel's Motive For Acquiring Maxwell Is Obvious And
        Irrelevant.* ...............................................................................................12

    C.  *Jones Apparel's Use of the Term "Attractive" Falls Far Short Of
        Constituting A False Statement.* ..............................................................17

II. THE PROXY CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE
    REVISED PRELIMINARY CONSENT SOLICITATION STATEMENT
    CONTAINS ALL INFORMATION MATERIAL TO INFORMED DECISION-
    MAKING REQUIRED BY APPLICABLE REGULATIONS. ......................................22

    A.  *Distant And Ancient Business Relationships Are Not Material As a Matter
        Of Law.* ...................................................................................................23

    B.  *The Revised Preliminary Consent Solicitation Statement Discloses The
        Nominees Qualifications* ..........................................................................29

    C.  *The Revised Preliminary Consent Solicitation Statement Discloses The
        Consent Procedures.* ...............................................................................30

    D.  *Jones Apparel's Statements Regarding Maxwell's Unwillingness To
        Consider Jones Apparel's Offer Are Accurate And Immaterial.* ...........31

III. APART FROM ITS INABILITY TO PLEAD, MUCH LESS PROVE, A
     LIKELIHOOD OF SUCCESS ON THE MERITS, MAXWELL FAILS TO
     SATISFY THE REQUIREMENTS FOR AN INJUNCTION. ......................................33

    A.  *Maxwell Will Not Suffer Irreparable Harm If The Court Denies Injunctive
        Relief.* .....................................................................................................33

Page

    B.    *The Balance Of Hardships Favors Jones Apparel.* ...............................................36

    C.    *The Public Interest Favors Refusing To Impose An Injunction.* ...........................37

CONCLUSION.................................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>Page(s)</u>

*Atlantic Coast Airlines Holdings, Inc., v. Mesa Aire Group, Inc.,*
   295 F. Supp. 2d 75 (D.D.C. 2003) ................................................................26, 28, 35

*Baron v. Smith*, 285 F. Supp. 2d 96 (D. Mass. 2003) ........................................21

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)....................................................10

*Beam v. Stewart*, No. 501,3002, 2004 WL 739152 6 (Del. Supr. Mar. 31,
   2004) ............................................................................................................28

*Biesenbach v. Guenther*, 588 F.2d 400 (3d Cir. 1978) ......................................16

*Campbell Soup Co. v. Giles*, 47 F.3d 467 (1st Cir. 1995) ..................................7

*Connecticut General Mortgage & Realty Investments v. Siddall,*
   [1981-82], Fed. Sec. L. Rep. (CCH) ¶ 98,409 (D. Mass. 1981) ...................12

*Data Probe Acquisition Corp. v. Datalab, Inc.*, 722 F.2d 1 (2d Cir. 1983) ...............11, 21

*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000) ............................26

*Dillon v. Berg*, 453 F.2d 876 (3d Cir. 1971)....................................................34

*ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094 (D. Mass. 1990)..............37

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ......................................................9

*Electric Specialty Co. v. International Controls Corp.,*
   409 F.2d 937 (2d Cir. 1969)......................................................................9, 12

*First Eagle Sogen Funds, Inc. v. Bank for International Settlements,*
   252 F.3d 604 (2d Cir. 2001)..........................................................................34

*Gearhart Industrial, Inc. v. Texas America/Fort Worth,*
   741 F.2d 707 (5th Cir. 1984) .........................................................................34

*Golub v. PPD Corp.*, 576 F.2d 759 (8th Cir. 1978)....................................17, 20

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)............................21

Page

*Hibernia Sav. Bank v. Ballarino*, 891 F.2d 370 (1st Cir. 1989) .........................................35

*Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837 (1st Cir. 1989)................................36

*I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*,
    936 F.2d 739 (2d Cir. 1991)................................................................................26, 28

*Iavarone v. Raymond Keyes Assocs.*, 733 F. Supp. 727 (S.D.N.Y. 1990).........................34

*J. I. Case v. Borak*, 377 U.S. 426 (1964) ..........................................................................22

*John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235 (S.D.N.Y. 1995)................................34

*Kas v. Finance General Bankshares, Inc.*, 796 F.2d 508 (D.C. Cir. 1986) .......................11

*Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988) .......................................................11, 20, 32

*Lichtenberg v. Besicorp Group, Inc.*, 43 F. Supp. 2d 376 (1999)......................................22

*MacFadden Holdings, Inc. v. JB Acquisition Corp.*,
    802 F.2d 62 (2d Cir. 1986)...........................................................................................11

*Mendell v. Greenberg*, 927 F.2d 667 (2d Cir. 1991) .........................................................16

*Mills v. Electric Automobile-Lite Co.*, 396 U.S. 375 (1970) .......................................34, 37

*Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d 388 (8th Cir.
    1976) ..............................................................................................................................34

*The MONY Group, Inc. v. Highfields Capital Mgmnt., Inc.*, No. 04 Civ.
    0916, 2004 WL 253330, at 6 (S.D.N.Y. Feb. 11, 2004)..............................................36

*New England Anti-Vivisection Society, Inc. v. United States Surgical
    Corp.*, 889 F.2d 1198 (1st Cir. 1989)..........................................................................21

*ONBANCorp. Inc. v. Holtzman*, 956 F. Supp. 250 (N.D.N.Y 1997) .................................36

*Polar International Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225
    (S.D.N.Y. 2000)............................................................................................................26

*Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140
    (2d Cir. 1979).................................................................................................................9

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975) ........................................................9

Page

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ...................................................................................................................7

*Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056 (1st Cir. 1991) .......................16, 37

*Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985) .................................................9

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) .............................................21

*TSC Industrial Inc. v. Northway Inc.*, 426 U.S. 438 (1976) ........................................10, 22

*Telvest v. Wisconsin Real Estate*, 489 F. Supp. 250 (E.D. Wis. 1980).............................35

*Weeks Dredging & Contracting, Inc. v. America Dredging Co.* 451 F. Supp. 468 (E.D. Pa. 1978) ..........................................................................9

## SEC NO ACTION LETTERS

*BT Bancorp, Inc., SEC No Action Letter*, 1999 WL. 231196 ............................................32

*Phoenix Gold International, Inc., SEC No Action Letter*, 2000 WL. 1726981...........................................................................................................................32

## FEDERAL STATUTES

15 U.S.C. § 78l.....................................................................................................................24

15 U.S.C. § 80a-13...............................................................................................................13

17 C.F.R. § 229.103 .............................................................................................................24

17 C.F.R. § 229.401(a).........................................................................................................24

17 C.F.R. § 229.404(a)-(c)....................................................................................................25

17 C.F.R. § 229.405 .............................................................................................................24

17 C.F.R. § 229.1004 ........................................................................................................ 18

17 C.F.R. § 229.1006(a) .................................................................................................... 13

17 C.F.R. § 240.14a-9(a) .................................................................................................. 22

17 C.F.R. § 240.14a-101 ................................................................................................... 24

## INTRODUCTION

On April 6, 2004, Maxwell Shoe Company, Inc. ("Maxwell") filed a motion for preliminary injunction, a motion for expedited discovery, and a motion for a short order of notice to schedule briefing these matters. The Court denied the requested short order of notice on April 9, 2004, and ordered the defendants to respond to the motion for preliminary injunction by April 16, 2004. On April 15, 2004 – after the close of business – Maxwell served the defendants with an amended complaint and an amended motion for a preliminary injunction, and withdrew the original motion to which the Court had ordered the defendants to respond. Maxwell claimed that the amendments were prompted by public filings made *on or before April 9, 2004.*

As developed below, the amended papers do not change the outcome of this matter. The amended complaint abandons claims that Maxwell now concedes are moot, and raises a few new arguments that embellish its earlier claims. But these are of no consequence. The complaint is still deficient as a matter of law. Everything in the amended complaint is subject to a motion to dismiss save perhaps for the sole allegation regarding defendants' nominee Harold Leppo being ineligible to serve on Maxwell Shoe's Board of Directors because he consulted for Financo and Financo consulted for Jones Apparel. (Am. Compl. ¶¶ 75-79.) This allegation is also baseless as it is based solely on a magazine article that inverted the facts regarding who Financo worked for in Jones Apparel's purchase of Gloria Vanderbilt – Financo actually represented Gloria Vanderbilt, not Jones Apparel. Once Maxwell's mistake is corrected, it is clear that this allegation cannot be maintained.

Although Maxwell continues to seek expedited discovery and an expedited response to its preliminary injunction, it does not explain why it delayed a week in

bringing this matter to the Court's attention, or why it filed its amended papers the eve before the defendants were ordered to respond to its original motion for a preliminary injunction. The immediacy of its claim for relief from this Court is consequently suspect.

On March 23, 2004, the defendants Jones Apparel Group, Inc. and MSC Acquisition Corp. (collectively "Jones Apparel") initiated a cash tender offer (the "Tender Offer") for all of the outstanding stock of Maxwell. On April 1, 2004, Maxwell filed this action to prevent its shareholders from deciding for themselves whether to accept the offer. Instead of allowing Maxwell's shareholders to make their own investment decisions, the plaintiff seeks to delay the consummation of the Tender Offer pending what it calls "curative" disclosure. That is completely improper. Maxwell's motion for a preliminary injunction should be denied.

In support of its attempt to delay, the amended complaint alleges that Jones Apparel's Tender Offer Statement and Revised Preliminary Consent Solicitation Statement omitted material information or otherwise misrepresented facts in violation of Sections 14(a) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act" or (as to Section 14(e), the "Williams Act").[1] But the claimed disclosure defects are facially invalid. None is logically relevant to a reasonable shareholder's investment or voting decision. The sum of Maxwell's complaint reduces to three allegations of inadequate disclosure:

> *First*, Maxwell claims that Jones Apparel failed to characterize its $20 Tender Offer in derogatory terms. The plaintiff asserts that Jones Apparel's use of the modifier "attractive" in describing the offer's

---

[1] The Tender Offer Statement is attached as Exhibit 3 and the Revised Preliminary Consent Solicitation Statement is attached as Exhibit 2 to the Declaration of Christopher Dillon in Support of Defendants' Motion to Dismiss and in Opposition for a Preliminary Injunction. ("Dillon Decl.").

premium to Maxwell's historic trading price is misleading because Maxwell would characterize it differently. Self-evidently, and as voluminous case law confirms, a bidder is under no legal compulsion to describe its own offer using the target's adjectives.

*Second*, Maxwell avers that Jones Apparel did not disclose its "secret, ulterior motive" for acquiring Maxwell – namely to secure for itself the "lucrative" benefits of Maxwell's license *from* Jones Apparel on Anne Klein footwear. However, the Tender Offer Statement does disclose the existence of the license, its terms, the fact that the license would be acquired as part of the transaction, and the specific revenue that the license now affords to Maxwell. A redacted version of the license agreement itself is even an exhibit to Jones Apparel's Tender Offer Statement.

*Third*, Maxwell asserts that Jones Apparel has not sufficiently disclosed the roles of its proposed board nominees at other companies or their purported ties to Jones Apparel. Plaintiffs' allegations are meritless. The information that Maxwell claims Jones Apparel must include in a consent solicitation statement is immaterial, as a matter of law. In deciding how to vote, no reasonable shareholder would consider as *important* a nominee's ancient and distant business relationships, a nominee's remote affiliations with companies that went bankrupt, or Jones Apparel's characterizations of Maxwell's actions.

On these three essential claims, there is no factual dispute. The only dispute is whether Maxwell's allegations could ever state a cognizable Williams Act or Exchange Act claim. The answer to that inquiry is an unqualified no.

Since Maxwell's allegations fail as a matter of law, there is no basis to delay the Tender Offer with an injunction requiring "curative" disclosure. The absence of a cognizable claim conclusively establishes the absence of likely success on the merits. Further, even if the Court permits this case to proceed, Maxwell is not entitled to a preliminary injunction because it has not shown either irreparable harm or that the balance of any hardship tips in its favor. To the contrary, and as the First Circuit has made clear, delaying Jones Apparel's Tender Offer, and depriving stockholders of the chance to make up their own minds, works irreparable harm on the bidder and Maxwell's owners. This Court should not be used to undermine the Williams Act's policy of

neutrality between contestants to a takeover bid by tipping the balance in favor of Maxwell through the entry of an unwarranted injunction.

For the reasons set forth below, Maxwell's application for an injunction should be denied.

## BACKGROUND FACTS

### *The Parties*

The plaintiff Maxwell is a Delaware corporation with its principal place of business in Massachusetts.  Maxwell is in the business of designing, developing, and marketing casual and dress footwear for women and children.  Maxwell's stock trades on the NASDAQ National Market.

The defendant Jones Apparel Group, Inc. is a Pennsylvania corporation with its principal place of business in Bristol, Pennsylvania.  For thirty years, Jones Apparel has been a leading designer and marketer of branded apparel, footwear, and accessories. Jones Apparel's nationally recognized brands include Jones New York, Evan-Picone, Norton McNaugton, Gloria Vanderbilt, Erika, l.e.i., Energie, Nine West, Easy Spirit, Enzo Angiolini, Bandolino, Napier, Judith Jack, Kasper, Anne Klein, Albert Nipon, and LeSuit. Jones Apparel Group's stock trades on the New York Stock Exchange.

MSC Acquisition Corp. is an indirect wholly-owned subsidiary of Jones Apparel Group, Inc. organized under the laws of the State of New York in order to make the offer, the proposed merger with Maxwell, and any possible future consent solicitation.

### *The Tender Offer and its Background*

On February 25, 2004, Jones Apparel announced that it had delivered a proposal to Maxwell to acquire all of the outstanding shares of Maxwell at a price of $20.00 per share in cash.  On March 12, 2004, Maxwell issued a press release indicating that its

board of directors had rejected Jones Apparel's proposal and refused to meet with Jones Apparel to discuss the proposal.

On March 23, 2004, Jones Apparel initiated the Tender Offer for all of the outstanding Class A Common Stock of Maxwell at a price of $20.00 per share. The Tender Offer originally expired on April 19, 2004 and has been extended until May 17, 2004. The full terms of the Tender Offer are found in the Tender Offer Statement filed with the United States Securities and Exchange Commission ("SEC") on Schedule TO and attached as Exhibit 2 to the Declaration of Christopher Dillon. Jones Apparel has subsequently filed six amendments to the Tender Offer Statement. (Dillon Decl. Ex. 4-9.) These amendments, the latest of which was filed on April 19, 2004, disclose further information about the Tender Offer. The initial Tender Offer Statement advises shareholders that such amendments will be filed from time to time to update shareholders.

On March 23, 2004, Jones Apparel filed a preliminary consent solicitation statement with the SEC ("Preliminary Consent Solicitation Statement"). The Preliminary Consent Solicitation Statement filed is attached as Exhibit 1 to the Declaration of Christopher Dillon. The Preliminary Consent Solicitation Statement indicates that Jones Apparel is considering proposing the removal of the members of Maxwell's board of directors to facilitate consummation of the Tender Offer.[2] Notwithstanding the fact that

---

[2] Jones Apparel proposes to replace Maxwell's incumbent board in order to remove obstacles to consummation of the Tender Offer. For example, as the Preliminary Consent Solicitation Statement explains, Jones Apparel does not intend to consummate the Tender Offer absent assurance that Maxwell's board will redeem Maxwell's "poison pill" Shareholder Rights Plan (and exempt the Tender Offer from the constraints of Section 203 of the Delaware General Corporations Law). (Dillon Decl. Ex. 1.) If the existing Maxwell board refuses to redeem the associated poison pill rights, notwithstanding their fiduciary duty, the election of Jones Apparel's

no consent solicitation had yet begun, Maxwell initiated this litigation on April 1, 2004.
On April 9, 2004, Jones Apparel filed a Revised Preliminary Consent Solicitation
Statement with the SEC in response to comments received in the ordinary course (as is
customary) from SEC staff reviewers. (Dillon Decl. Ex. 2.) The SEC has since advised
Jones Apparel that it has no further comments.

On April 9, 2004, the Court denied Maxwell's motion for short order of notice,
and ordered the defendants to respond to Maxwell's motion for preliminary injunction by
April 16, 2004. On April 15, 2004, after the close of business, Maxwell served Jones
Apparel with an amended complaint and an amended motion for a preliminary injunction,
which Maxwell states supercede its earlier documents. Maxwell states that it has filed
the amended complaint and motion in response to Jones Apparel's amendments to the
Tender Offer and Revised Preliminary Consent Solicitation Statement, which were filed
on or before April 9, 2004. In substance, Maxwell's amended papers abandon a number
of arguments that Maxwell now concedes were indisputably moot and reframes some of
its earlier allegations. Despite its efforts to repackage its claims, Maxwell's arguments
fail to justify the extraordinary remedy of a preliminary injunction.

## THE COMPLAINT'S ALLEGATIONS

Maxwell summarizes the allegations of its complaint on page two of its
Memorandum in Support of its Motion for Preliminary Injunction:

- Defendants still have not disclosed their significant business relationships with
  certain of their Board nominees ("Defendants' Nominees"). These relationships
  call into question Defendants' claim that Defendants' Nominees are
  "independent" of Defendants. This information is material to Maxwell Shoe

---

nominees who then act to redeem the rights may be necessary to permit Jones Apparel to
consummate the Tender Offer.

stockholders because if the Consent Solicitation succeeds, Defendants' Nominees will be able to approve the Tender Offer.

- Defendants still have not disclosed that certain of Defendants' Nominees were directors and/or managers of companies that went bankrupt or were delisted during defendants' Nominees' affiliations with those companies, and that Defendants' Nominee Harold Leppo is ineligible to serve on Maxwell Shoe's Board of Directors under the Company's Bylaws. These facts call into question Defendants' claim that Defendants' Nominees are "highly qualified." This information is material to Maxwell Shoe stockholders because if the Consent Solicitation succeeds, Defendants' Nominees with their histories of business failures, will nevertheless be left in charge of Maxwell Shoe.

- Defendants still have not fully disclosed the facts relating to Jones's acquisition of the licensor's rights under a license for the AK Anne Klein brand name (the "License"),[3] pursuant to which Maxwell Shoe is licensee, The continuing omission is material to Maxwell Shoe stockholders because understanding the extent of Jones's desire to stand on both sides of the License would affect their valuation of the Tender Offer and consideration of whether to respond to the Consent Solicitation.

## ARGUMENT

The award of a preliminary injunction "requires consideration of (1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). None of these four considerations favor Maxwell.

---

[3] A redacted copy of the License, executed November 1, 1999 and with effect from July 1999, and an amendment, dated March 19, 2002, as filed with the SEC, are attached, respectively, as Exhibits 1 and 2 to the Declaration of James J. Tinagero in Support of Plaintiff's Motions for a Preliminary Injunction and for Expedited Discovery, executed April 6, 2004 ("Tinagero Decl.").

**I.    THE WILLIAMS ACT CLAIMS ARE FACTUALLY AND LEGALLY UNTENABLE BECAUSE THE TENDER OFFER STATEMENT CONTAINS ALL INFORMATION MATERIAL TO INFORMED DECISION-MAKING AND REQUIRED BY APPLICABLE REGULATIONS.**

Plaintiff alleges that the Tender Offer contains misrepresentations and omissions in violation of the Williams Act,[4] Section 14(e) of the Exchange Act.  But those allegations cannot withstand stand scrutiny for four fundamental reasons.  Maxwell's allegations of defective disclosure are flatly inconsistent with the Williams Act's disclosure regime, which contemplates strict neutrality between bidder and target in contested takeover matters.  Those allegations would simply tip the playing field in its favor notwithstanding that policy.  More important, Maxwell's disclosure claims are legally untenable.  Maxwell seeks disclosures the rules do not require, and that case law has emphatically rejected.  Equally significant, Maxwell ignores the disclosure that the Tender Offer Statement *does* make.  The Tender Offer's *actual* disclosures extinguish Maxwell's contrived claims completely.  And at bottom, Maxwell overlooks the interests of its own shareholders, and what is relevant to their investment decision.  The "curative" disclosure that Maxwell claims to seek simply would not assist a stockholder in deciding to accept or reject Jones Apparel's offer, or issue or withhold a consent to replace the incumbent board.    Irrelevant information does not promote more informed decisionmaking.

---

[4] Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

A.    *The Williams Act's Disclosure Regime*

As the Supreme Court has repeatedly stated, Congress adopted the Williams Act to ensure that investors faced with tender offers and other substantial acquisitions of securities would receive full and fair disclosure of facts necessary to make an informed investment decision. *See, e.g., Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 9 (1985).

In establishing a framework for hostile tender offers, Congress intended the disclosure provisions to provide a *neutral* scheme that favored neither the offeror nor incumbent management of the target company. Although early drafts of the Williams Act "'were avowedly pro-management', . . . Congress became convinced 'that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management.'" *Edgar v. MITE Corp.*, 457 U.S. 624, 633 (1982) (internal quotations and citations omitted); *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58-59 (1975) ("Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts").

Accordingly, district judges have a "responsibility not to allow management to 'resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers.'" *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140, 1148 (2d Cir. 1979) (quoting *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969)).

The Williams Act "does not require that the offeror disclose all the information that it possesses about itself or the target company." *Weeks Dredging & Contracting, Inc. v. Am. Dredging Co.*, 451 F. Supp. 468, 482 (E.D. Pa. 1978). Rather, the Williams

Act, Section 14(a) of the Exchange Act, and applicable SEC regulations require bidders to disclose only *material* information that is specifically prescribed in rules set by the SEC.[5]

Consistent with the goal of preventing incumbent target company management from using the disclosure of the Williams Act (or the proxy rules) as a pretext for dilatory litigation, the Supreme Court has deliberately set the "materiality" threshold sufficiently high to avoid "bury[ing] the shareholders in an avalanche of trivial information." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus. Inc. v. Northway Inc.*, 426 U.S. 438, 448-49 (1976)). The Supreme Court has held that a given "fact is material if there is a *substantial likelihood* that a *reasonable shareholder would* consider it *important* in deciding" whether to tender his shares – i.e., a fact is not material unless a reasonable shareholder would consider it as significantly altering the "total mix" of information already available in connection with the tender offer. *Basic*, 485 at 231 (emphasis added) (citations omitted).

In addition to requiring only the disclosure of *material* facts, the cases make it clear that the federal securities laws generally do not countenance "nit-picking" or self-flagellation. As the Second Circuit Court of Appeals has held:

> The disclosure required by the [Williams] Act is not a rite of confession or exercise in the common law pleading. What is required is the disclosure of objective factual matters.

---

[5] The Williams Act disclosure regime is thus similar to the disclosure requirements recognized by the First Circuit under the Securities Act of 1933. In a registration statement and prospectus for the offering of securities, an issuer is obliged only to disclose what the SEC's Forms and Regulations prescribe, and information necessary to make statements made not misleading. But it is not obliged to disclose anything else merely on the claim that it is "material."

*Data Probe Acquisition Corp. v. Datalab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983); *see also Lessler v. Little*, 857 F.2d 866, 875-76 (1st Cir. 1988) (citing *Data Probe* with approval).

Moreover, once the material facts are disclosed, a tender offeror is under no obligation to characterize, editorialize or label them in any pejorative or disparaging manner demanded by incumbent target company management. *See Data Probe*, 722 F.2d at 5-6 ("The disclosure required by the Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters."); *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 517 (D.C. Cir. 1986); ("The defendants need not label or editorialize on the disclosed facts, at least where the potential conflict would be obvious to any reasonable shareholder."); *Lessler*, 857 F.2d at 875 ([T]he federal securities laws "are designed principally to impose a duty to disclose and inform rather than to become enmeshed in passing judgments on information elicited.").

In short, the Williams Act requires only that a tender offeror disclose objective material factual matter. In adopting the statutory scheme governing tender offers, Congress did not create a tool to enable target companies to "subject[] every tender offer to a nit-picking judicial scrutiny which will in the long run injure shareholders by preventing them from taking advantage of favorable offers." *MacFadden Holdings, Inc. v. JB Acquisition Corp.*, 802 F.2d 62, 71 (2d Cir. 1986) (citation omitted). As the Second Circuit observed long ago:

> Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the [Williams Act] a potent tool for incumbent management [or competing

tender offerors] to protect [their] own interests against the
desires and welfare of the stockholders.

*Elec. Specialty Co.*, 409 F.2d at 948.  *Accord Connecticut Gen. Mortgage & Realty Invs.*

*v. Siddall*, [1981-82] Fed. Sec. L. Rep. (CCH) ¶ 98,409 at 94,448 (D. Mass. 1981).

**B.    *Jones Apparel's Motive For Acquiring Maxwell Is Obvious And Irrelevant.***

Maxwell avers that Jones Apparel has violated the Williams Act by not disclosing

what it claims is Jones Apparel's motive for acquiring Maxwell.  Maxwell summarizes

these allegations on page fifteen of its Memorandum in Support of its Motion for

Preliminary Injunction:

> Defendants' failure to disclose material facts relating to its acquisition of
> Kasper also renders the Tender Offer Statement and the Revised Consent
> Statement materially misleading.  Defendants do not disclose that in
> August 2003, Jones won the bankruptcy auction for Kasper and made its
> first overture to Maxwell Shoe the next month, in September 2003.
> (Tinagero Decl. ¶¶ 4, 7.)  Instead, the Revised Consent Statement only
> states that Jones acquired Kasper on December 1, 2003. (Offenhartz Decl.
> Ex. 1 at 16.)  Defendants' misleading disclosures as to when Jones won
> the bankruptcy auction for Kasper and when Jones began its pursuit to
> acquire Maxwell Shoe are material to Maxwell Shoe stockholders.
> Without this information showing the relationship between the timing of
> the Kasper acquisition and Jones's first approach to Maxwell Shoe, the
> stockholders cannot properly evaluate the Tender Offer of the Consent
> Solicitation because they will not understand how long and by what varied
> means Jones has been working to stand on both sides of the License and
> inferentially, what great value it has to Jones.

In short, Maxwell claims that Jones Apparel's Tender Offer misleads Maxwell

stockholders asked to decide to accept or reject $20 for their shares on the ground that

they are "ignorant" of Jones Apparel's "ulterior" motive for acquiring those shares.  The

law, the Tender Offer's actual disclosures and common sense all demonstrate that

Maxwell's claim is utterly baseless.

First, the securities regulations simply do not require bidders to disclose their subjective "motivation" for a proposed acquisition. Rather, the applicable regulation, Regulation M-A, simply requires that Jones Apparel "[s]tate the purposes of the transaction" and any plans related to certain listed events or transactions, including, mergers, sales of assets, changes in dividends, changes in the board, and changes in corporate structure. 7 C.F.R. § 229.1006(a), (c)(1)-(7).[6] Jones Apparel has disclosed all of the relevant information about its actual purpose and plans regarding its acquisition of Maxwell. Namely, that Jones intends to "acquire control of, and ultimately the entire equity interest in, Maxwell," which, self-evidently, would include all of Maxwell's assets, contracts, and earnings power. (Tender Offer Statement, Dillon Decl. Ex. 3 under the heading "Why Are You Making This Offer?" of the Summary Term Sheet at i, and at iv, 24-29.)

Moreover, Jones Apparel has fully disclosed its interest in the Anne Klein license, which it acquired through its acquisition of Kasper. Specifically, Jones Apparel has disclosed the terms of the Anne Klein license, how it acquired the license, the value of

---

[6] (c) Plans. Describe any plans, proposals or negotiations that relate to or would result in: (1) Any extraordinary transaction, such as a merger, reorganization or liquidation, involving the subject company or any of its subsidiaries; (2) Any purchase, sale or transfer of a material amount of assets of the subject company or any of its subsidiaries; (3) Any material change in the present dividend rate or policy, or indebtedness or capitalization of the subject company; (4) Any change in the present board of directors or management of the subject company, including, but not limited to, any plans or proposals to change the number or the term of directors or to fill any existing vacancies on the board or to change any material term of the employment contract of any executive officer; (5) Any other material change in the subject company's corporate structure or business, including, if the subject company is a registered closed–end investment company, any plans or proposals to make any changes in its investment policy for which a vote would be required by Section 13 of the Investment Company Act of 1940 (15 U.S.C. § 80a–13); (6) Any class of equity securities of the subject company to be delisted from a national securities exchange or cease to be authorized to be quoted in an automated quotations system operated by a national securities association; (7) Any class of equity securities of the subject company becoming eligible for termination of registration under section 12(g)(4) of the Act (15 U.S.C. § 78l); 7 C.F.R. § 229.1006(c)(1)–(7) (Item 1006(c)(1)–(7)).

the license to Maxwell and Jones Apparel, and its plans regarding it following

consummation of the acquisition. A redacted copy of the license is even attached as an

exhibit to the Schedule TO. The Tender Offer Statement, including amendments, states

in relevant part:

> Jones Investment Co. Inc. ("JIC"), a wholly owned subsidiary of Jones,
> and Maxwell are parties to a license agreement granting Maxwell certain
> exclusive licensed rights to use certain trademarks (consisting of the AK
> Anne Klein, Kasper, Albert Nipon and other related trademarks, the
> "Marks")) in connection with the manufacture, advertising, promotion,
> distribution and sale of women's footwear in approved retail channels in
> the United States and, with respect to licensed products bearing the Kasper
> and Nipon trademarks, Canada and Puerto Rico. JIC has also granted
> Maxwell a revocable right to sell licensed products bearing the AK Anne
> Klein trademark to specified channels and accounts in Canada and Puerto
> Rico. The license is currently effective until December 31, 2007, but
> Maxwell has the right, subject to certain conditions in the license
> agreement, to extend the term of the license agreement to December 31,
> 2012.
>
> Maxwell pays JIC a royalty on all net sales of such footwear licensed
> under the license agreement and is responsible for a guaranteed minimum
> royalty payment to JIC during each year of the agreement. Based on
> information made publicly available by Maxwell, Maxwell's net sales
> relating to the Marks for Maxwell's fiscal quarter ended January 31, 2004
> and for Maxwell's fiscal years ended October 31, 2003 and October 31,
> 2002 were $17.3 million, $75.1 million and $64.1 million, respectively
> (with such net sales representing approximately 31.9%, 33.4%, and
> 31.4%, respectively, of the net sales of Maxwell under the license
> agreement for the periods indicated).
>
> The license agreement provides that if Maxwell contemplates the sale or
> other disposition of a controlling share of its business or assets related to
> the subject matter of the agreement, including, without limitation, through
> a sale of stock (but not including (1) a sale or disposition in which
> Maxwell's management is an equity participant in the acquiring party, (2)
> sales that occur in the ordinary course of public trading or (3) sales to or
> other stock distributions through Maxwell's employee benefit plans), JIC
> may terminate the agreement if it does not approve the proposed
> transaction and Maxwell nevertheless elects to transfer ownership or
> control of its business or assets related to the subject matter of the license
> agreement. Upon such a termination, the parties are to negotiate the timing
> of such termination. The license agreement provides that the foregoing
> termination right does not arise if the business or assets sold by Maxwell

do not relate to the license agreement and if such sale does not, directly or indirectly, constitute a sale or transfer of the license agreement or Maxwell's rights thereunder or interfere with Maxwell's ability to carry out its material obligations thereunder.

Maxwell has filed a redacted version of the license agreement described above as an exhibit to the Maxwell 10-K. A copy of that redacted version is filed as Exhibit (d) to the Schedule TO filed by Jones and Purchaser with the SEC in connection with the Offer on March 23, 2004 pursuant to Rule 14d-3 under the Exchange Act. Reference is made to such Exhibit for a more complete description of the terms and conditions of the license agreement.

In the ordinary course of business, certain Jones subsidiaries purchase licensed footwear from Maxwell.

Jones acquired Kasper A.S.L., Ltd. ("Kasper"), which owned the rights to the AK Anne Klein brand name, on December 1, 2003 for a total consideration of $259.3 million in cash. Prior to its acquisition by Jones, Kasper owned the Marks and was the licensor under the license agreement. JIC became a party to the license agreement after Jones acquired Kasper.

From December 1, 2003 (the date of Jones' acquisition of Kasper) to April 3, 2004, Jones and its subsidiaries recorded revenues aggregating approximately $1.12 million related to the license agreement.

As a result of the Offer and the Proposed Merger, Jones would acquire the license agreement and the other product lines of Maxwell, and Jones currently intends to incorporate the product offerings of Maxwell, including the products offered under the license agreement, into the product offerings of Jones. After consummation of the Offer and the Proposed Merger, Jones would acquire all revenues generated by Maxwell in respect of the Maxwell products licensed under the license agreement and, while Jones has not made a decision in this regard, it is possible that Jones would cause the license agreement to be canceled.

(Tender Offer Statement, Dillon Decl. Ex. 3 at 24, as amended by Ex. 7 and Ex. at 8.)

These disclosures confirm the emptiness of Maxwell's charge. Since the Tender

Offer Statement discloses what Jones Apparel now owns (the Anne Klein license), what

it will obtain if it successfully acquires Maxwell (the opposite side of that license), and

the revenue stream to Maxwell now associated with that license, no shareholder could

conceivably be interested in more information about Jones Apparel's subjective "motives." It is obvious that, if the Tender Offer succeeds, Jones Apparel will effectively be both licensor and licensee – and thus will be able to terminate the contract – with all the financial consequences that flow therefrom. A shareholder simply could not be less interested in the (equally obvious) "subjective motivation" of Jones Apparel to accomplish that result.

That logical result is confirmed by case law. Having disclosed the material facts about the transaction, namely its intent to acquire the entire company and, thereby, acquire the "lucrative" benefits of *all* of Maxwell's asset – including the Anne Klein license – Jones Apparel's motive for doing so is utterly irrelevant, as a matter of law:

> (I)t is bemusing, and ultimately pointless, to charge that directors perpetrated a "material omission" when they failed to (a) discover and adjudged faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external.

*Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) (internal quotations and citations omitted); *Royal Bus. Group, Inc.* v. *Realist, Inc.,* 933 F.2d 1056, 1064 (1st Cir. 1991) ("there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose . . . plaintiffs can identify no legal basis on which an affirmative duty to disclose might rest"); *see also Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1991) ("A proxy statement need not disclose the underlying motivations of a director or major shareholder so long as all the objective material facts relating to the transaction are

disclosed."), *modified on other grounds* 938 F.2d 1528 (1991); *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir. 1978).

These cases establish, as a matter of law, that no reasonable shareholder will consider Jones Apparel's motive in making an informed investment decision. In deciding whether to accept the cash offer, Maxwell's shareholders will consider the value of the company they are selling – including assets such as the Anne Klein license – and will not concern themselves with Jones Apparel's secret ulterior motive for acquiring the company or a particular asset.

**C.     *Jones Apparel's Use of the Term "Attractive" Falls Far Short Of Constituting A False Statement.***

Maxwell asserts that Jones Apparel's use of the modifier "attractive" in describing the offer's premium to Maxwell's historical trading price is misleading because Maxwell would characterize the offer in a different manner.     Maxwell summarizes these allegations on page sixteen of its Memorandum in Support of its Motion for Preliminary Injunction:

> This disclosure is also necessary in light of Defendants' false and misleading assertion that the Tender Offer price of $20 per share is "an attractive premium" for Maxwell Shoe's stockholders.     Defendants provide no explanation as to why this claim is true.     Very simply, Maxwell's Shoe's stock closed at $22.09 on March 22, 2003 – the day before Defendants filed the Tender Offer Statement and began the Tender Offer at $20 per share. (Offenhartz Decl. Ex. 8.)  The stock has remained over $22 per share every day since, as it did for nearly a month previously, since the day after Jones announced its proposal to buy the Company. (Id.)  Defendants fail to explain why Maxwell Shoe's shareholders should tender their shares for more than $2 per share less than what they could receive immediately on the open market, or why Defendants' Nominees would "consider" the Tender Offer under such circumstances, as the Revised Consent Statement promises they will do.  These omissions are material to the stockholders' understanding of whether the "premium" is attractive, unattractive, or simply nonexistent.