The securities regulations do not, however, require bidders to characterize their offers using the adjectives that the target's management might use, and as discussed above, Jones Apparel's motive is both apparent and immaterial.

Item 4 of Schedule TO identifies the information that a bidder is required to disclose in a tender offer statement regarding the terms of the transaction. Item 4 states that a third-party bidder is required to provide the information contained in Item 1004(a) of Regulation M-A:

§ 229.1004 (Item 1004) Terms of the transaction.

(a) Material terms. State the material terms of the transaction.

(1) Tender offers. In the case of a tender offer, the information must include:

(i)      The total number and class of securities sought in the offer;
(ii)     *The type and amount of consideration offered to security holders;*
(iii)    The scheduled expiration date;
(iv)    Whether a subsequent offering period will be available, if the transaction is a   third-party tender offer;
(v)     Whether the offer may be extended, and if so, how it could be extended;
(vi)    The dates before and after which security holders may withdraw securities tendered in the offer;
(vii)   The procedures for tendering and withdrawing securities;
(viii)  The manner in which securities will be accepted for payment;
(ix)    If the offer is for less than all securities of a class, the periods for accepting securities on a pro rata basis and the offeror's present intentions in the event that the offer is oversubscribed;
(x)     An explanation of any material differences in the rights of security holders as a result of the transaction, if material;
(xi)    A brief statement as to the accounting treatment of the transaction, if material; and
(xii)   The federal income tax consequences of the transaction, if material. 17 C.F.R. § 229.1004 (emphasis added).

Jones Apparel fully complied with its disclosure obligations, including Item 1004(a)(1)(ii), which requires the disclosure of the "the type and amount of

consideration offered to security holders." Jones Apparel complied with this provision

by disclosing that it was offering $20.00 cash per share:

> We are offering to purchase all the outstanding Shares at a price of $20.00
> per share, net to the seller in cash, without interest.
>
> On February 18, 2004, the day Jones informed Maxwell of our proposal to
> acquire all the outstanding Shares, the last reported sales price of a Share
> on the Nasdaq National Market System was $17.59. On February 24,
> 2004, the last trading day prior to Jones's first public announcement that it
> was seeking to enter into a business combination with Maxwell, the last
> reported sales price of a Share on the Nasdaq National Market System was
> $18.40. On March 22, 2004, the last trading day prior to the
> commencement of the offer, the last reported sales price of a Share on the
> Nasdaq National Market System was $22.09. AS OF APRIL 6, 2004, THE
> LAST REPORTED SALES PRICE OF A SHARE ON THE NASDAQ
> NATIONAL MARKET SYSTEM WAS ABOVE THE $20.00 PER
> SHARE PRICE TO BE PAID PURSUANT TO THE OFFER. If you are
> the record owner of your Shares and you tender Shares in the offer, you
> will not have to pay any brokerage or similar fees. However, if you own
> your Shares through a broker or other nominee, and your broker tenders
> your Shares on your behalf, your broker or nominee may charge you a fee
> for doing so. You should consult your broker or nominee to determine
> whether any charges will apply.
>
> (Tender Offer Statement, Summary Term Sheet, Dillon Decl. Ex. 3 at i, as
> amended by Ex. 7.)

As a matter of practice, bidders also usually disclose a recent price of the target's

stock, and Jones Apparel complied with this practice by disclosing:

- the high and low price for each of the ten quarters since the quarter ending
  January 31, 2002 (taken from Maxwell's 10-Ks);[7].

- the highest price that Maxwell's stock had reached during this period
  ($19.06);

- the price the stock was trading on the date that Maxwell made its initial
  proposal to Maxwell ($17.59);

---

[7] As contemplated by Item 1002(c) of Regulation M-A.

- the closing price on February 24, 2004, the last date before Jones Apparel announced that it was seeking to enter into a business combination with Maxwell ($18.40); and

- the price that the stock was trading at on the last trading date before the Tender Offer was commenced ($22.09).

(Tender Offer Statement, Dillon Decl. Ex. 3 at 13, as amended by Ex. 7.)

To the extent a shareholder was interested in obtaining any other pricing data, such information is readily available from a variety of sources, including newspapers, brokerage firms, and the internet. Indeed, the Tender Offer Statement advises in the Summary Term Sheet, "Please obtain a recent quotation for your Shares prior to deciding whether or not to tender." (Tender Offer Statement, Summary Term Sheet, Dillon Decl. Ex. 3, at iv.)

Jones Apparel has disclosed all of the required information regarding the terms of the Tender Offer so that shareholders may reach their own conclusions. Jones Apparel's characterization of its price as "attractive" or – as Maxwell urge – "lowball" is utterly *not* material. In *Lessler,* the First Circuit rejected this same type of frivolous allegation. 857 F.2d at 869. Petitioners claimed that a proxy statement was materially false and misleading because it characterized a management company contract as a "legitimate" investment advisory contract, rather than "a guise and a sham to conceal the true fact[s]." The court rejected this 'characterization' allegation out of hand: it constituted "complaining about the wording and editorial presentation of the proxy statement, not its substance" and thus, "[u]nder established case law, this claim must fail." *Id.* (quoting *Golub,* 576 F.2d at 765 ("[Plaintiffs'] complaint is that those who prepared the statement did not characterize the bonus aspect of the transaction as plaintiffs would have it characterized. Under the Act and regulations plaintiffs were not entitled to have such a

9422371_2                                   -20-

'disclosure' or such a characterization.")); *see also Data Probe,* 722 F.2d at 5-6 ("The disclosure required by the Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters."). Jones Apparel's characterization of its offer is the type of corporate puffery that courts routinely find to be immaterial to a shareholder's investment decision. *See Shaw* v. *Digital Equip. Corp.,* 82 F.3d 1194, 1218 (1st Cir. 1996) ("a claim that a fraud was perpetrated on the market can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery"), *superseded by statute on other grounds,* as noted in *Greebel* v. *FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir. 1999); *Baron* v. *Smith,* 285 F. Supp. 2d 96, 106 (D. Mass. 2003) (comments "were the kinds of optimistic statements that the market would easily recognize as nothing more than a kind of self-directed corporate puffery and thus not actionable.") (internal quotation omitted).

These cases recognize that the Williams Act requires that shareholders decide for themselves, based on all the disclosed material information, whether they concur that the proposal is in fact "attractive." As the First Circuit has explained:

> [C]orporations are not required to address their stockholders as if they were children in kindergarten. In short, federal law is satisfied as long as the [disclosure] materials fully and fairly set forth the relevant and material facts from which a reasonable shareholder may draw his own conclusions.

*New England Anti-Vivisection Soc'y, Inc. v. United States Surgical Corp.,* 889 F.2d 1198, 1202 (1st Cir. 1989) (internal citations omitted). Here, as a matter of law, no shareholder could be misled by Jones Apparel's characterization of its offer.

## II.    THE PROXY CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE REVISED PRELIMINARY CONSENT SOLICITATION STATEMENT CONTAINS ALL INFORMATION MATERIAL TO INFORMED DECISION-MAKING REQUIRED BY APPLICABLE REGULATIONS.

Plaintiff also alleges that the Revised Preliminary Consent Solicitation Statement contains misrepresentations and omissions in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9, which were enacted to ensure that shareholders engage in autonomous and informed decision-making in voting their shares. Like the Williams Act claims discussed above, Congress made it unlawful for a corporation to issue a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). A shareholder's right to vote is at the heart of the proxy statement protections in Section 14(a) and SEC Rule 14a-9: "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC*, 426 U.S. at 449. These provisions were enacted to help guarantee that investors faced with a proxy contest would receive full and fair disclosure so as to make an informed decision. *J. I. Case* v. *Borak*, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.").[8]

---

[8] As a matter of law, no-one has been misled, nor could anyone be misled, by the mere filing of a *preliminary* consent solicitation statement. The SEC's rules governing consent solicitations require a proponent to file "preliminary" soliciting material with the Commission. SEC Rule 14a-6(a). Federal courts have confirmed this common sense proposition that there is no cause of action based on "preliminary" material intended for use in the ultimate solicitation of votes or consents because no reasonable stockholder can conceivably rely on material that does not actually solicit such a vote or consent. *See, e.g., Lichtenberg v. Besicorp Group, Inc.*, 43 F.

The information that Maxwell claims Jones Apparel must include in a consent solicitation statement is immaterial as a matter of law. In deciding how to vote, no reasonable shareholder would consider as *important* a nominee's ancient and distant business relationships, a nominee's remote affiliations with companies that went bankrupt, or Jones Apparel's characterizations of Maxwell's actions. Nor would a reasonable shareholder fail to grasp the implications of the proposed consent solicitation with respect to the Tender Offer.

### A.    *Distant And Ancient Business Relationships Are Not Material As a Matter Of Law.*

In its complaint, Maxwell alleged that Jones Apparel failed to disclose a series of relationships between Jones Apparel's nominees and Jones Apparel. Specifically Maxwell summarized its allegations against Jones Apparel in its Memorandum of Law in Support of Plaintiff's Amended Motion for a Preliminary Injunction as follows:

- Jones is a client of Financo, for whom Defendants' Nominee Harold Leppo performs consulting work. (See Lane Decl. Exs. 6, 7.)

- Current Jones director Howard Gittes was a director and chairman of Sunbeam Corporation's compensation committee during the same time period that Defendants' Nominee Robert D. Martin served as Senior Vice President and Chief Financial Officer, International, at Sunbeam. (Id. Exs. 3 at 7, 11 at 3; 13.)

- Merrill Lynch underwrote two public offerings of Jones Apparel stock – one offering of 3.1 million shares in 1994 (offered in part by Jones director Sidney Kimmel) and another offering of 4.5 million shares in 1997. At these times, Defendants' Nominee Michael Koeneke, served as co-head of Merrill Lynch's Global Mergers and Acquisitions department (Id. Exs. 3 at 6; 13; 11; 15.)

---

Supp. 2d 376, 390–91 (S.D.N.Y. 1999); *Scattergood v. Perelman*, No. 90–3451, 1990 WL 72801, at *6 (E.D. Pa. May 29, 1990). Thus, to the extent that Maxwell believed that additional disclosure was required, the proper redress would have been to make a request to the SEC for an amendment to Jones Apparel's Revised Preliminary Consent Solicitation Statement, not to file an action for securities fraud.

- The Revised Consent Statement likewise fails to disclose that this is at least the third instance in which Koeneke has been nominated by a hostile acquirer to serve on the board of a target company. (Id. Exs. 16, 17.) Another of the hostile acquirors, Simon Property Group ("Simon"), does significant business with Jones and/or its subsidiaries in connection with retail stores operated by Jones and its subsidiaries (such as Easy Spirit and Nine West) in malls owned by Simon. (Id. Ex. 18) (Pl. Mem. at 12-13.)

The rules governing disclosure make clear that none of this information is legally material. The applicable regulations require Jones Apparel to disclose a range of information regarding its nominees:

- Their positions and offices, terms of office, and any arrangement or understanding they have with management. *See* Item 401(a) to Regulation S-K, 17 C.F.R. § 229.401(a).
- Any family relationships with other directors or officers or nominees. *See* Item 401(d) to Regulation S-K, 17 C.F.R. § 229.401(d).
- Their basic business experience, background, and other directorships. *See* Item 401(e) to Regulation S-K, 17 C.F.R. § 229.401(e).
- Involvement in legal proceedings, including lawsuits and bankruptcy. *See* Item 401(f) to Regulation S-K, 17 C.F.R. § 229.401(f); *see also* Instruction 4 to Item 103 of Reg. S-K, 17 C.F.R. § 229.103.
- Certain financial transactions with family members or management. *See* Item 404(a)-(c) to Regulation S-K, 17 C.F.R. § 229.404(a)-(c).
- Compliance with SEC regulations relating to beneficial ownership and control, as required by Section 12 of the Exchange Act. *See* Item 405 to Regulation S-K, 17 C.F.R. § 229.405; *see also* § 12 of Exchange Act, 15 U.S.C. § 78*l*.
- *See generally* Item 7 of Schedule 14A, 17 C.F.R. § 240.14a-101 (listing requirements).

Jones Apparel has complied with these requirements and has disclosed the following in its Revised Preliminary Consent Solicitation Statement:

| Name, Age and Business (or Residence) Address | Principal Occupation or Employment During the Last Five Years and Other Directorships |
| --- | --- |
| Allan Corn (Age, 60)<br>1 Edgewood Circle<br>Orangeburg, NY 10962 | Mr. Corn is a financial consultant for ACE Consulting LLC, a financial consulting firm. From 1990 to December 2003, Mr. Corn was Senior Vice President and Chief Financial Officer of Michael Anthony Jewelers, Inc., a designer and manufacturer of fine jewelry. Since 1989, Mr. Corn has been a Director of Michael Anthony Jewelers, Inc. |

9422371_2

-24-

| Name, Age and Business (or Residence) Address | Principal Occupation or Employment During the Last Five Years and Other Directorships |
|---|---|
| Jeffrey J. Hass (Age, 42)<br>New York Law School<br>57 Worth Street<br>New York, NY 10013 | Since 2000, Professor Haas has been a Professor of Law at The New York Law School. From 1996 until 2000, Mr. Haas was Associate Professor of Law at The New York Law School. Professor Haas also serves as Trustee of The Watchdog Fund Trust and Sector Funds Trust, both of which are management investment companies. |
| Michael S. Koeneke (Age, 57)<br>Knightspoint Partners, LLC<br>787 Seventh Avenue<br>9th Floor<br>New York, NY 10019 | Since March 2003, Mr. Koeneke has served as a Managing Member of Knightspoint Partners LLC, which is engaged in the business of acquiring, holding or disposing of investments in various companies. Mr. Koeneke was elected director of CPI Corp., in March, 2004. From 1997 through 2002, Mr. Koeneke was the co-head and then the Chairman of Global Mergers and Acquisitions at Merrill Lynch & Co., Inc., an investment bank. |
| Harold Leppo (Age, 66)<br>71 Lynam Road<br>Stamford, CT 06903 | From 1988 to 1999, Mr. Leppo served as the Chief Executive Officer of Harold Leppo and Company, a retail consulting firm. Mr. Leppo also served as Director of Home Base Inc., an operator of home improvement warehouses, from 2001 to 2003, Director of J. Baker, Inc., a retailer of apparel and footwear, from 1997 until 2003, Director of Filenes Basement Corp., an operator of off-price specialty stores, from 1993 to 2000 and Director of Salant, Inc., a designer and manufacturer of menswear apparel products, from 1995 to 1999. |
| Robert D. Martin (Age, 56)<br>605 Blue Teal Court<br>Atlanta, GA 30327 | From 2000 to January 2004, Mr. Martin was Senior Vice President and Chief Financial Officer of Russell Corporation, an apparel and athletic company. From June 1999 to August 2000, Mr. Martin was Senior Vice President and Chief Financial Officer, International of Sunbeam Corporation, a designer, manufacturer and marketer of branded consumer products. Sunbeam Corporation filed for bankruptcy of February 6, 2001. From 1990 to 1999, Mr. Martin was Vice President and Chief Financial Officer of Sara Lee Branded Apparel, Europe, a global manufacturer and marketer of brand-name products. |

(Preliminary Consent Solicitation, Dillon Decl. Ex. 1 at 6-7)

Jones Apparel has thus disclosed all of the information required by the SEC's regulations. Contrary to Maxwell's suggestion, those regulations do not require the disclosure of distant and tenuous relationships because, as a matter of law, no reasonable

shareholder would view such information as material.   *See, e.g., Desaigoudar* v. *Meyercord*, 223 F.3d 1020, 1026 (9th Cir. 2000) (holding proxy statement not misleading where facts did not support an inference that reasonable shareholders would have considered director's relationship with outside company in determining how to vote); *Polar Int'l. Brokerage Corp.* v. *Reeve*, 108 F. Supp. 2d 225, 244-45 (S.D.N.Y. 2000) (holding failure to disclose director's prior business relationship was not materially misleading when relationship was remote and fact would not have been significant in reasonable shareholder's deliberations); *Atlantic Coast Airlines Holdings, Inc., v. Mesa Aire Group, Inc.*, 295 F. Supp. 2d 75, 86 (D.D.C. 2003) ("The evidence of prior business or social relationships is insufficient to render the Mesa nominees unfit to be directors"); *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 739, 762 (2d Cir. 1991) (internal quotation omitted) (including peripheral information in proxy statement violates the purpose of the federal securities law which "require that disclosure[s] [to shareholders] steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment.").

Maxwell also challenges the preliminary disclosure document by claiming that three of the five potential nominees, Messrs. Leppo, Martin and Koeneke, have undisclosed business relationships with Jones Apparel. The relationships, to the extent they even exist, are not material as a matter of law. To the contrary, the rules that govern disclosure of nominees' biographies reveals that Maxwell's claim is akin to a tortured game of "six degrees of separation" in which no reasonable stockholder confronted with an investment decision could conceivably be interested.

Based on news reports – evidently drawn off the internet without much verification – Maxwell avers that potential nominee Mr. Harold Leppo is a consultant to Financo and that Jones Apparel is a client of Financo. Maxwell argues that as a result of this relationship, Mr. Leppo is ineligible to serve as a director pursuant to section 3.2 of Maxwell's Bylaws. (Pl. Mem. at 16.) However, Jones Apparel is not, and has not been during at least the relevant disclosure period, a client of Financo. (Decl. of Ira Dansky ¶¶ 2-5.) Financo represented the opposite side of the deal when Jones Apparel sought to acquired Gloria Vanderbilt Apparel Corporation. (*Id.* ¶ 5.) Thus, rather than demonstrating Mr. Leppo's dependence on Jones Apparel, the facts establish Mr. Leppo's independence from Jones Apparel. And those same facts demonstrate that Maxwell's unqualified reliance on a single news article that had the facts upside down is a further indication of Maxwell's motive to delay Jones Apparel's bid with a "say anything" strategy.

Maxwell also claims that Jones Apparel's Revised Preliminary Consent Solicitation Statement is materially misleading about the "independence" of Mr. Howard Gitis, an outside director of Jones Apparel. The plaintiff asserts that – four years ago – Mr. Gitis *was* also an outside director of Sunbeam Corporation at the same time that Mr. Martin, one of the other nominees, *was* the CFO of Sunbeam (July 1999 to August 2000). Maxwell raises the spectre of nominees "comprised" as a result of personal relationships. (Pl. Mem. at 13.) But the inference that Maxwell attempts to raise is utterly immaterial. The alleged "relationship" demonstrates only that someone associated with Jones Apparel *knew* at least one of the individuals that it is considering nominating to Maxwell's board. Knowledge, common directorships, and other associations simply

do not amount to a conflict of interest or require disclosure. *See, e.g., Beam v. Stewart*, No. 501,3002, 2004 WL 739152, at *6 (Del. Mar. 31, 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."); *Mesa Aire*, 295 F. Supp. at 86 (same).

Finally, Maxwell asserts that the preliminary soliciting materials are defective because they do not disclose that Mr. Koeneke (1) was the co-head of Merrill Lynch's Global Mergers and Acquisitions department in 1994 and 1997 when Merrill Lynch underwrote (along with other investment banks) two public offerings of Jones Apparel; and (2) he serves as a director of Simon Property Group, which owns various malls in which Jones Apparel (and countless other companies) lease space. (Pl. Mem. at 12-13.) Maxwell does not allege that Mr. Koeneke even knows anyone at Jones Apparel, much less that he has the type of relationships with Jones Apparel that his independence reasonably might be called into question. Maxwell thus implies that Mr. Koeneke would be beholden to any company for which Merrill Lynch has underwritten securities or that conducts retail operations in a shopping mall. It is no surprise that Maxwell cites no legal authority for its claim that these facts constitute a conflict of interest, as none exists. Indeed, these facts would contribute to the very of "flood of collateral data" which offerors may not engage in. *I. Meyer Pincus & Assocs., P.C.*, 936 F.2d at 762.

Maxwell takes no issue with the independence of the other two nominees, Messrs. Corn and Haas. Accordingly, Maxwell's assertion that the Revised Preliminary Consent Solicitation Statement "falsely assert[s]" that the nominees are independent (Pl. Mem. at 12) is reduced to a false assertion about Financo, an allegation of a four-year-old

acquaintance at Sunbeam, an allegation that a former senior employee at Merrill Lynch is beholden to any company whose securities Merrill Lynch underwrote seven to ten years ago, and an allegation that a director of Simons is beholden to any company that leases space in a Simons mall. As a matter of law, the Court can conclude that these ancient and distant relationships are immaterial.

**B.    *Information Concerning Nominees' Affiliations With Certain Companies Do Not Bear Upon The Nominees' Qualifications And Need Not Be Disclosed.***

Maxwell asserts, with no basis, that the nominees have "questionable abilities," who "have left a string of failed companies in their wake." Maxwell does not challenge the abilities of three nominees, but alleges that Mr. Corn's affiliation (as a director and CFO) with Michael Anthony Jewelers since 1989, which reported losses during the past six quarters (and was delisted in February), and Mr. Leppo's service as an outside director of three companies that went bankrupt between 1999 and 2001, should have been disclosed. (Pl. Mem. at 13-14.) Maxwell is wrong.

Item 401(f)(1) of Regulation S-K requires disclosure of bankruptcy proceedings with respect to a director nominee only where he or she was an "executive officer" of the bankrupt corporation at or within two years of the bankruptcy filing. The regulation instructs:

> (f) **Involvement in Certain Legal Proceedings**. Describe any of the following events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant:
> (1) A petition under the federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such a person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing[.]

The SEC has also made clear that that this disclosure requirement applies only where the director nominee was an executive officer and that it does not apply to "significant employees." Division of Corporate Finance, Manual of Publicly Available Telephone Interpretations (1997), I (16). Maxwell does not allege that any of the nominees meet these disclosure criteria.

Finally, Maxwell does not allege that Messrs. Corn or Leppo caused these companies to fail. Instead, the complaint's allegations insinuate that their mere association with enterprises that ultimately failed bears upon their "qualifications" to serve as directors of Maxwell. However, Maxwell does not (and cannot) cite any statute, regulation or precedent requiring the disclosure of this information. To the contrary, as discussed above, the applicable SEC regulations in this area clearly provide that such information is not required to be disclosed. *See* Regulation S-K, 401(f)(1).

### C.    *The Revised Preliminary Consent Solicitation Statement Discloses The Consent Procedures.*

In its amended complaint, Maxwell asserts that the Revised Preliminary Consent Solicitation Statement contains "Misleading Statements about the Process and Consequences of Giving Consent," a catch-all title Maxwell uses to shovel in an assortment of baseless allegations. (Am. Compl. ¶¶ 109-21.) Although Maxwell's original memorandum in support of its motion for a preliminary injunction contained a section devoted to these allegations, its amended memorandum does not. The deliberate removal of these arguments, speaks volumes to Maxwell's own views as to their substance. Specifically,

- Maxwell claims that Jones Apparel has not disclosed that the tender offer calls for a second stage merger (Am. Compl. ¶114.); *but the second-stage merger is disclosed in both the Tender Offer Statement and the Revised*

*Preliminary Consent Solicitation Statement.* The first line of the section of the Tender Offer Statement regarding the purpose of the Tender Offer states: "The purpose of the Offer is to enable Jones to acquire control of, and *ultimately the entire equity interest in*, Maxwell." (Tender Offer Statement, Dillon Decl. Ex. 3 at 24 (emphasis added).) The Tender Offer Statement then goes on to describe that second-step merger process and states that the price shall be at the highest price offered during the Tender Offer. Similarly page (ii) of the Revised Preliminary Consent Solicitation Statement Purchaser states that Jones Apparel "currently intends, promptly following consummation of the Offer, to seek to have Maxwell consummate a second-step merger," and then describes the terms of that transaction.

- During a March 31 conference call, in response to an analysts question regarding Maxwell's adoption of golden parachute plans, Jones Apparel's CEO, Peter Boneparth, told certain analysts "[w]e're not shareholders of Maxwell obviously, and that's something that the Maxwell shareholders have to come to grips with." Maxwell asserts that the statement that "Jones is not a shareholder of Maxwell" is false. (Am. Compl. ¶¶ 109-11.) To the extent anyone other than Maxwell's attorneys were confused by the intent of this statement, the publicly filed transcript contains a note stating that Jones Apparel and its subsidiaries own 100 shares of Maxwell's stock, which is also disclosed in the Tender Offer Statement and the Revised Preliminary Consent Solicitation Statement. (Dillon Decl. Ex. 10.)

- Maxwell asserts, without explanation, that the Revised Preliminary Consent Solicitation Statement does not comply with Item 14 of Schedule 14. (Am. Compl. ¶¶ 116-21.)  In fact, the Tender Offer discloses that Jones Apparel contemplates a second-stage merger in the event that a majority of the shareholders tender their shares in response to the offer. At that time, Jones Apparel would own a majority of the outstanding shares, and the votes of the minority shareholders would be unnecessary to approve the second-stage transaction. (Tender Offer Statement, Dillon Decl. Ex. 3 at iii) ("If the offer is successful, we expect to consummate a second-step merger with  Maxwell in which Maxwell will become an indirect wholly owned subsidiary of Jones.").

**D.    *Jones Apparel's Statements Regarding Maxwell's Unwillingness To Consider Jones Apparel's Offer Are Accurate And Immaterial.***

After hurling assertions that the Nominees are not independent, have "questionable abilities," and "have left a string of failed companies in their wake" Maxwell asserts that Jones Apparel has disparaged Maxwell's board by making the following statement in its Revised Preliminary Consent Solicitation Statement:

We are seeking your support for the removal of each current director of Maxwell and the election of our five nominees because we believe that the current directors of Maxwell are not acting, and will not act, in your best interests with respect to the offer.

(Dillon Decl. Ex. 2, at Proposed Letter to Stockholders, 2.)

Maxwell asserts that such a statement "impl[ies] that the Board is breaching its fiduciary duty to the Company's stockholders" and thereby violates Rule 14a-9. (Pl. Mem. at 17.)[9]  Of course, the statement is merely a factual response to Maxwell's decision to reject Jones Apparel's Offer and not to pursue discussions with Jones Apparel. Jones Apparel's characterization of those actions is not material or actionable.[10] *Lessler*, 857 F.2d at 869.

Maxwell further contends that Jones Apparel assumed responsibility in its Revised Preliminary Consent Solicitation Statement to advise shareholders "promptly"

---

[9] The authorities cited by Maxwell are inapposite. In *Phoenix Gold International, Inc.*, SEC No Action Letter, 2000 WL 1726981, the SEC stated that the shareholder had to remove from its cumulative voting proposal the words "permitting outside shareholders the opportunity to elect a truly independent director." Notably the SEC did not allow the company to strike the following language from the supporting statement: "Cumulative voting won't put minority shareholders in control of the board. But it will give minority shareholders the first real opportunity to elect independent-minded directors who will urge management to find ways to enhance value for all shareholders." In *CCBT Bancorp, Inc.*, SEC No Action Letter, 1999 WL 231196, the SEC did strike the shareholders supporting statement but not – as Maxwell avers – because it said the board was not independent, but because the statement said the board did not provide complete information, the board was not independent and the "[b]oard used intimidation to get the minimum number of shareholder votes required." That matter was also colored by the shareholder's history of soliciting unusual proxies, including one to change the annual meeting date to Memorial Day because "the stock certificates have the likeness of them of the American Indian . . . it's historically correct to hold said meeting on Memorial Day so as to acknowledge how the Pilgrims mistreated said original inhabitants [of] this continent." *Id* at *4.

[10] Maxwell also highlights a comment made by Mr. Boneparth during a March 31, 2004, analyst call. (Pl. Mem. at 17.)  Maxwell's argument ignores the context in which Mr. Boneparth's comments were made. The "fairly irresponsible acts" are not as Maxwell implies, the board's rejection of Jones Apparel's proposal (and refusal to pursue discussions), but the board's recent failure to take action to limit unusually generous golden parachute plans for senior management. (Dillon Decl. Ex. 10.)

regarding all "developments" in its pending lawsuit against Maxwell in the Delaware Court of Chancery, and specifically to inform them about the status of one of the several specific causes of action in Jones Apparel's complaint – that Maxwell's Board breached its fiduciary duties. (Pl. Mem. at 18.) However, the Revised Preliminary Consent Solicitation Statement makes no such promise and does not even mention Jones Apparel's breach of fiduciary duties claims. Rather, the Revised Preliminary Consent Solicitation Statement simply states that Jones Apparel will "promptly inform [the shareholders] when the Court of Chancery has resolved th[e] issue" raised in the Delaware litigation (*i.e.*, whether Maxwell's Board properly set the record date with respect to the determination of Maxwell stockholders entitled to consent in writing to Jones Apparel's solicitation). (Revised Preliminary Consent Solicitation Statement, Dillon Decl. Ex. 2 at i.) Jones Apparel never committed to update shareholders with regard to the particular vagaries of the fast-moving Delaware action, but rather promised to inform them as to resolution of the fundamental issue in dispute. (*Id.*) The record date issue remains unresolved, the Delaware litigation is still ongoing, and whether Jones Apparel has added or withdrawn specific causes of action in advancing its position in that case is immaterial.

## III.  APART FROM ITS INABILITY TO PLEAD, MUCH LESS PROVE, A LIKELIHOOD OF SUCCESS ON THE MERITS, MAXWELL FAILS TO SATISFY THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

### A.  *Maxwell Will Not Suffer Irreparable Harm If The Court Denies Injunctive Relief.*

Even if Maxwell could demonstrate a likelihood of success on the merits – which it cannot – Maxwell's argument that it will be irreparably harmed absent an injunction is based on bald and speculative assertions that do little more than expose Maxwell's

complaint and motion for a preliminary injunction for what they are – mere dilatory tactics devoid of substance.

This Court has already properly recognized that Maxwell will not be irreparably harmed if the Tender Offer is allowed to proceed. In its Order on Plaintiff's Motion for a Short Order of Notice, the Court held:

> I see no likelihood of irreparable harm if, as plaintiffs relate in their memorandum, defendants' tender offer is at a price below market value of the outstanding shares. I have to assume that the Company's stockholders are rational economic actors who will not agree to sell shares to defendants for $20 that the market prices at $22.

As the Court also recognized, even if the assumption that Maxwell's stockholders will act rationally is incorrect, "the federal securities laws afford defrauded shareholders a wide range of remedies, including money damages." *See also, First Eagle Sogen Funds, Inc. v. Bank for Int'l Settlements*, 252 F.3d 604, 607 (2d Cir. 2001) (holding that any injury as a result of plaintiff's tendering of shares "can be adequately redressed by monetary damages"); *accord Gearhart Indus., Inc. v. Texas Am./Fort Worth*, 741 F.2d 707, 716 (5th Cir. 1984); *Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d 388, 395 (8th Cir. 1976); *John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235, 248 (S.D.N.Y. 1995); *Iavarone v. Raymond Keyes Assocs.*, 733 F. Supp. 727, 732 (S.D.N.Y. 1990); *Telex Corp. v. Edelman*, No. 87-C-873-E, 1987 WL 43390, at *3 (N.D. Okla. Nov. 5, 1987). For example, courts have unwound elections or ordered new solicitation processes when circumstances justified such measures. *See, e.g., Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375, 386 (1970) ("Possible forms of relief [for violation of proxy rules] will include setting aside the merger or granting other equitable relief"); *Dillon* v. *Berg*, 453 F.2d 876, 877 (3d Cir. 1971) (district court invalidated annual shareholder's

meeting and mandated conditions of eligibility for participation in subsequent special meeting); *Telvest* v. *Wisconsin Real Estate*, 489 F. Supp. 250, 255 (E.D. Wis. 1980) (voiding proxies obtained by both management and shareholders as a result of false and misleading statements).

Maxwell's suggestion that such remedies would be inadequate here because the Court will not be able to "unscramble the eggs" absent an injunction is disingenuous. (Pl. Mem. at 9.) If Maxwell establishes that there is an omission or misstatement, then the proper remedy is further disclosure. Jones Apparel has already amended its Tender Offer Statement and Preliminary Consent Solicitation in response to comments that it has received from the SEC and those documents, if necessary, may be amended again. Maxwell's allegation that it will "sustain irreparable harm" from the allegedly "uncorrected, materially false and misleading statements" (Pl. Mem. at 10.) that are contained in Tender Offer documents fail as a matter of law. *See Hibernia Sav. Bank v. Ballarino*, 891 F.2d 370, 373 (1st Cir. 1989) ("Curing any alleged defects [in tender offer disclosures] precludes a showing of irreparable harm."); *Mesa Aire*, 295 F. Supp. 2d at 85 ("To the Extent that any of Mesa's statements or omissions during the consent statement process may have been questionable or incomplete . . . The final Consent Statement has addressed any earlier disclosure infractions").

Finally, Maxwell nakedly asserts that a successful tender offer would cause "chaos for the Company and devastate its plans for the future" and that, even if the tender offer does not succeed, shareholders "would be left with negative impressions of the Board based on Jones's disparaging statements." (Pl. Mem. at 10.) Such doomsday predictions are "too speculative and causally tenuous to support a preliminary

injunction." *The MONY Group, Inc. v. Highfields Capital Mgmnt., Inc.*, No. 04 Civ.

0916, 2004 WL 253330, at \*6 (S.D.N.Y. Feb. 11, 2004) (rejecting predictions that

outcome of merger vote based on allegedly misleading information "would be

'devastating': a credit ratings downgrade, a rapid decline in stock prices, and a mass

exodus of [the] sales force may ensue"); *ONBANCorp. Inc. v. Holtzman*, 956 F. Supp.

250, 257 (N.D.N.Y 1997) (allegations concerning "corporate reputation are speculative

and do not relate to the purpose of the proxy solicitation rules"). Maxwell has failed to

establish irreparable harm.

### B.    *The Balance Of Hardships Favors Jones Apparel.*

Maxwell's purpose in seeking this injunction is not to correct perceived

deficiencies in the Tender Offer or Consent Solicitation, but to delay, and thereby

foreclose, Jones Apparel's ability to present this issue to the shareholders of Maxwell. If

the Tender Offer is delayed, the harm to Jones Apparel and Maxwell's shareholders is

clear. *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 853 (1st Cir. 1989) ("[I]t is

obvious that timing is everything with tender offers.").

Maxwell seeks to enjoin shareholders from accepting Jones Apparel's Tender

Offer, when the totality of its allegations are (1) that Jones Apparel characterized its offer

as attractive, and (2) that it has a secret ulterior motive to be on both sides of the Anne

Klein license. But Maxwell cannot possibly be hurt if shareholders are given the chance

to make their own investment decisions. To the extent these perceived omissions are of

any interest to shareholders, there is no danger that the shareholders will not consider the

omitted information when deciding whether to tender their shares. Maxwell has loudly

broadcast the fact that its shares currently trade above the Tender Offer price (a fact that

is disclosed in the newspapers, the internet, the Tender Offer Statement, and the Revised

Preliminary Consent Solicitation Statement).  Maxwell has also disclosed at every opportunity what it perceives to be Jones Apparel's "secret ulterior motive."  No reasonable investor, who reads the Tender Offer – including the attached Anne Klein license agreement – is going to be surprised that Jones Apparel intends to acquire this valuable license.  The harm to Jones Apparel in stopping the Tender Offer is obvious; the harm to Maxwell is non-existent.

     **C.**    ***The Public Interest Favors Refusing To Impose An Injunction.***

Stopping the offer also harms Maxwell's shareholders.  One of Congress' primary purposes in enacting the securities fraud provisions was to enable shareholders to engage in autonomous decisions, whether on a tender offer or a consent solicitation.  *See, e.g., Mills*, 396 U.S. at 620 ("[Section] 14(a) stemmed from a congressional belief that [f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange") (internal quotation omitted). Courts in this Circuit have repeatedly recognized the importance of protecting shareholders' right to vote. *See, e.g., Royal Bus. Group, Inc.* v. *Realist, Inc.* 933 F.2d 1056, 1060 (1st Cir. 1991) (quoting *Electric Auto-Lite Co.,* 396 U.S. at 381) ("Section 14(a) was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with an 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'"); *ER Holdings, Inc.* v. *Norton Co.* 735 F. Supp. 1094, 1100 (D. Mass. 1990) ("the right to vote is a right that is inherent in and incidental to the ownership of corporate stock, and as such is a proprietary right. It follows that the stockholder cannot be deprived of the right to vote his or her stock") (quoting 5 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATION AND BUSINESS ORGANIZATIONS § 2025 (rev. perm. ed. 1976)).  Granting Maxwell's request

for preliminary injunction, with no threat of irreparable harm and no likelihood of success on the merits, will prevent Maxwell's shareholders from exercising their rights and thus will only serve to undermine the public interest.

## CONCLUSION

For all the foregoing reasons, the Court should deny the motion for preliminary injunction.

Respectfully submitted,

John D. Donovan, Jr. (130950)
Christopher Dillon (640896)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
617-951-7000

*Counsel for Jones Apparel Group, Inc., and MSC Acquisition Corp.*

Paul C. Saunders
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, New York 10019
212-474-1000

April 20, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2004, I caused a true copy of the above document to be served by hand upon counsel of record for the plaintiff.

Christopher Dillon